UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | |
| Plaintiff, | Criminal No. 19-cr-257-MJD-KMM |
| v. | |
| Amanda Marie Letourneau (1), | **REPORT AND RECOMMENDATION** |
| Defendant. | |

This matter is before the Court on Amanda Marie Letourneau's Motion to Suppress Statements (ECF No. 38) and Motion to Suppress Search and Seizure (ECF No. 40). After careful consideration, the Court recommends that Ms. Letourneau's Motions be DENIED.

## I.  Factual Background

On August 28, 2019, law enforcement officers executed a search warrant at the shared home of Ms. Letourneau and her co-defendant Michael Voelz. (Feb. 26 Trans., ("R.") ECF 72 at 10–11, 13.) The warrant permitted officers to search the entire property, including the house and outbuildings, a particular Dodge pickup that had been present for the controlled buys that supported the warrant, and Mr. Voelz's person. (Ex. 1 at 1, 4.)

More than a dozen officers executed the search warrant. (R. at 13.) They "lined up in a group" and approached the home's open garage with weapons drawn. (*Id.*) Inside the open garage were three occupants: Ms Letourneau, Mr. Voelz, and a friend. (*Id.* at 12.) All three were immediately handcuffed, and Ms. Letourneau was pat-searched. (*Id.* at 15.) During this initial interaction, Ms. Letourneau indicated that her three-year-old son was sleeping upstairs in the residence. (*Id.* at 15.) After completing a protective sweep of the residence, Detective Bill Hudson adjusted Ms.

Letourneau's handcuffs to the front and then accompanied her into the house to retrieve her child. (*Id.* at 17.) On their way, Ms. Letourneau repeatedly told Detective Hudson that she wanted to cooperate with the police. (*Id.*) She also advised that she did not want officers destroying her house, and that she would show him where all of "it" was. (*Id.* at 17–18.) Detective Hudson believed "it" meant drugs. (*Id.* at 18.)

### A. Walkthrough of House and Garage

Instead of immediately leading Detective Hudson through the house, Ms. Letourneau and the detective went to an outside play area where Ms. Letourneau and the child played under the supervision of a female officer. (R. at 18.) After an unspecified amount of time, Deputy Hudson returned to the play area and told Ms. Letourneau, "Okay, let's go." (*Id.* at 18–19.) They walked to the house so she could show the officers where the controlled substances were located. At no point was she released from her handcuffs, nor was she *Mirandized*.

Detective Hudson and Ms. Letourneau went to the master bedroom, where Ms. Letourneau pointed out a lockbox hidden in the bedroom. (R. at 19.) She got the key for officers, who opened the box and discovered a small bag of methamphetamine inside. (*Id.*) Detective Hudson then asked her where the rest of the methamphetamine would be found. She replied that it was downstairs in the garage. (*Id.* at 19–20). When Detective Hudson followed up by asking how much there would be, she stated about a pound to a pound-and-a-half. (*Id.* at 20–21.)

Ms. Letourneau and Detective Hudson went to the garage, where they found the search underway. (R. at 21.) The officers had already found "a good size chunk of methamphetamine." (*Id.*) After Ms. Letourneau arrived at the garage, she indicated to the officers searching that the methamphetamine was not in the box they were currently searching, and then directed them to a different one. (*Id.* at 21–22.) When officers opened the box that Ms. Letourneau had identified, they found approximately one pound of methamphetamine inside. (*Id.* at 21.) During the walkthrough of the home and garage, Ms. Letourneau reiterated her desire to cooperate. (*Id.* at 24.)

While in the garage, officers asked Ms. Letourneau about a key for a locked gun

2

safe. (*Id.* at 22–23.) Although Ms. Letourneau told them where to find the key, they could not locate it, and had to break in anyway. The safe contained firearms. (*Id.* at 23.)

Following the walkthrough of the house and the garage, Detective Hudson brought Ms. Letourneau back to the play area to be with her son under the supervision of the female officer. (R. at 24.) Approximately five to ten minutes later, Detective Hudson returned and brought Ms. Letourneau to his car to speak with her. (*Id.* at 24–25.)

### B.   First Interview

Ms. Letourneau and Detective Hudson sat in Detective Hudson's car for the interview, with Ms. Letourneau in the front passenger seat, and the detective in the driver's seat. (R. at 25.) Ms. Letourneau was "very talkative" as Detective Hudson prepared to interview her. (*Id.* at 26–27.) He told her that he would first take a recorded statement from her, and then would talk to her about further cooperation with the police without being recorded. (*Id.*) Using his cell phone to make the recording, Detective Hudson began the interview. (*Id.* at 26.) Ms. Letourneau reiterated her willingness to cooperate, but Detective Hudson stopped her, saying there is a whole "dog and pony show I gotta do." (Ex. 2 0:00–0:25). Ms. Letourneau replied with "Oh, the whole *Mirandas* and all?" (*Id.*) Detective Hudson then informed Ms. Letourneau that she had been arrested and read her *Miranda* rights. (*Id.* at 1:45–2:25.) Ms. Letourneau indicated that she understood her rights, after which Detective Hudson asked her if, keeping her rights in mind, she still wanted to answer questions. Ms. Letourneau told the detective that she was willing to continue the interview. Detective Hudson informed her that she should tell him if she did not want to answer a question, and that he would stop talking to her whenever she wanted. (*Id.*)

The two then spoke for several minutes, during which Ms. Letourneau made several incriminating statements about her involvement in selling drugs. (*Id.* at 2:25–11:20.) At the end of the recorded interview, Detective Hudson asked Ms. Letourneau if she had any questions for him, to which she replied, "not while I'm being recorded." (*Id.* at 11:20–25.) Detective Hudson then ended the interview. Ms Letourneau returned to the play area with her son while Detective Hudson conducted

3

a similar interview with her co-defendant Mr. Voelz. (R. at 29–30.)

### C. Second Interview

Approximately 30 to 50 minutes after the end of Ms. Letourneau's first interview with Detective Hudson, he brought her back to the squad car in order to conduct an unrecorded interview during which they could discuss the possibility of her cooperation with law enforcement. (R. 32.) Detective Hudson did not reread Ms. Letourneau her *Miranda* rights. (*Id.* at 33.) Over the course of this second interview, she told Detective Hudson about her source of supply and discussed the logistics she used to obtain and pay for drugs. (*Id.* at 33–34.) Ms. Letourneau also told Detective Hudson that she had used her phone to contact her drug supplier. When he asked her where it was, she indicated that it was charging in her car—a car not specifically named in the search warrant. Detective Hudson retrieved the phone from the car, but Ms. Letourneau refused to provide the password to the phone without a plea deal or assurances from the police in writing. (*Id.* at 34–36.)

## II. Analysis

Ms. Letourneau challenges the legality of the house walkthrough, the two interviews, and the seizure of her cell phone. After careful consideration, the Court recommends that her motions to suppress be denied.

### A. The Walkthrough

First, Ms. Letourneau argues that the statements made during the walkthrough of the house with Detective Hudson should be suppressed because they were made during an un-*Mirandized* custodial interrogation. The Court disagrees that *Miranda* warnings were required and concludes that the statements made during that time period are admissible.

#### i. Standard

Individuals must be read certain warnings before being subject to custodial interrogation. *United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010) (citing *Miranda*

*v. Arizona*, 384 U.S. 436, 444 (1966)).  Warnings are only required when both elements—custody and interrogation—are met.  *United States v. Griffin*, 922 F.2d 1343, 1347, 1357 (8th Cir. 1990).  The government has conceded that Ms. Letourneau was in custody at all relevant times, and the Court agrees.  Therefore, the focus here is whether Ms. Letourneau was interrogated when Detective Hudson led her through the house as she volunteered information about the location of methamphetamine.

Interrogation for the purposes of *Miranda* occurs when a suspect is subjected to "express questioning or its functional equivalent," including words or actions "that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).  Statements volunteered by an individual in custody are not subject to the *Miranda* requirements.  *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989).  Limited follow-up questions asked by officers when a suspect has volunteered information do not convert freely offered statements into an interrogation that triggers the requirements of *Miranda*.  *E.g.*, *United States v. Jackson*, 852 F.3d 764, 771–72 (8th Cir. 2017).  Against this legal backdrop, the Court finds that Ms. Letourneau was not interrogated for the purposes of *Miranda*.

### ii.     The Walkthrough

Ms. Letourneau argues that Detective Hudson's act of leading her through the house was, for the purposes of *Miranda*, the functional equivalent of questioning.  However, not all actions rise to the level of interrogation.  Instead, when determining whether interrogation has occurred despite the absence of traditional questioning, a Court must consider whether an officer's actions are "likely to subjugate the individual to the will of his examiner and thereby undermine the privilege against *compulsory* self-incrimination."  *Arizona v. Mauro*, 481 U.S. 520, 526 (1987) (quotation and citation omitted) (emphasis added).  Actions that courts have found likely to elicit a response similar to questioning include lineups with coached witnesses; the "reverse line-up"; and psychological ploys seeking to cast blame on the victim or minimizing the seriousness of the alleged offense.  *Innis*, 446 U.S. at 299.  In other words, actions that are the functional equivalent of interrogation have a "measure of compulsion above and beyond that inherent in custody itself."  *Butzin*, 886 F.2d at 1018.

There is no evidence of such compulsion during the walkthrough with

5

Detective Hudson. Officers did not confront Ms. Letourneau with evidence already located, seek to "trick" her by downplaying the seriousness of her situation, or harass her into showing them where the methamphetamine was. *See Innis*, 446 U.S. at 299; *United States v. McArthur*, No. 12-cr-26(1) (JRT/JSM), 2012 WL 6194396 at *4 (D. Minn. Dec. 12, 2012) (finding no interrogation when officer picked up drugs in front of defendant, but did not confront him with it by, for example, shoving it in his face or holding it in front of him for a long period of time). Most important to this analysis is the fact that Ms. Letourneau volunteered to walk through the house with Detective Hudson with absolutely no prompting from law enforcement, and repeatedly expressed her desire to cooperate. Had the officer asked for her input as a means to avoid damage to her home, it would have been interrogation. However, merely following up on her offer does not rise to the level of coercion that the Supreme Court was concerned with in *Innis*.

Ms. Letourneau argues that even without compulsion, the walkthrough was interrogation because Detective Hudson should have known that this action was "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 303. And this reality is hard to deny: the officer would have no reason to conduct the walkthrough other than to learn the location of the drugs his team was seeking. However, the Court ultimately concludes that because Ms. Letourneau initiated the walkthrough by offering to show law enforcement where the drugs were hidden, and because there is no evidence of coercive behavior on behalf of the officers, the walkthrough was not an interrogation.

"Far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desireable." *Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (quoting *United States v. Washington*, 431 U.S. 181, 187 (1977). Officers are not under an obligation to stop a criminal defendant about to make an incriminating statement in order to provide *Miranda* warnings. *Tolliver v. Sheets*, 594 F.3d 900, 920 (6th Cir. 2010) ("Police may listen to volunteered statements, and need not interrupt a suspect who is volunteering information in order to deliver a *Miranda* warning."). Here, Ms. Letourneau volunteered to show the officers "where it is" in an effort to spare her house the sort of damage she had experienced during the execution of a previous search warrant. Detective Hudson did not need to somehow prevent her from volunteering that information. *C.f. Mauro*, 481 U.S. at 528–29 (finding that

6

interrogation for the purposes of *Miranda* did not occur when officers permitted defendant to speak to his spouse, even though they acknowledged there was a possibility that he would incriminate himself).

Certainly, Detective Hudson's subsequent action of walking Ms. Letourneau through the house in response to her offer presents a unique situation. Neither Ms. Letourneau nor the government has cited any cases directly on point with the factual circumstances in this case, and this Court's independent research has found none. However, cases in which officers have pursued a course of action short of interrogation in the hopes that incriminating information would be given seem most analogous to this case.

Ms. Letourneau argues that because she told Detective Hudson that she would tell him where the methamphetamine was hidden, he knew that walking Ms. Letourneau through the house was "reasonably likely to elicit an incriminating response." But this argument improperly shifts the focus of the Court's inquiry from one that considers the impression of the suspect to solely considering the expectations of the police. *Mauro*, 481 U.S. at 527 (noting that the standard for interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police."). What Detective Hudson expected Ms. Letourneau would do when walked through the house is not as important to the Court's inquiry as whether Ms. Letourneau felt coerced or even enticed into providing information. *See United States v. Bailey*, 831 F.3d 1035, 1038–39 (8th Cir. 2016) ( "[A]n expectation of voluntary statements does not amount to deliberate elicitation of an incriminating response." (quoting *United States v. Hernandez-Mendoza*, 600 F.3d 971, 977 (8th Cir. 2010))).

In reality, Ms. Letourneau spontaneously offered information and Detective Hudson accepted. The Court can find no case in which an offer to volunteer the location of contraband in order to avoid a potentially destructive search is suppressed for lack of *Miranda* warnings. And the voluntariness of Ms. Letourneau's spontaneous offer to help is further demonstrated by her repeated expression of a desire to "cooperate," presumably in an effort to reduce her possible sentence or avoid prosecution.

Finally, Ms. Letourneau argues that Detective Hudson's follow-up questions to

her were interrogation, even if the initial part of the walk through was not. Specifically, she asserts that Detective Hudson improperly asked her where the rest of the methamphetamine was after she showed him where some was hidden in a bedroom, and asked how much there was after she said that the rest of the drugs were in the garage. These brief follow-up questions do not rise to the level of interrogation. *Jackson*, 852 F.3d at 771–72; *see also United States v. Koontz*, 143 F.3d 408, 411 (8th Cir. 1998) ("[S]tatements made in response to a law enforcement officer's attempt to seek clarification of a defendant's remarks, during an interview requested by the defendant, are not the products of interrogation.").

In sum, Detective Hudson did not engage in custodial interrogation for the purposes of *Miranda* when he accepted Ms. Letourneau's offer to walk through the house so she could show him where methamphetamine was hidden. Ms. Letourneau's statements made during that time should not be suppressed.

### B.     The Interviews

Ms. Letourneau next argues that her later interviews with Detective Hudson in his squad car must both be suppressed because they are the product of her initial unlawful interrogation. This argument fails for two reasons. First, the Court has already determined that Ms. Letourneau's walkthrough with Detective Hudson was not an unlawful interrogation. Second, even if the Court agreed that the statements made during the walkthrough we unlawfully obtained, the later interviews would still not require suppression.

#### i.     Legal Framework

Where a defendant has made incriminating statements during an interrogation that had no *Miranda* warnings, the Eighth Circuit uses a test from Justice Kennedy's concurrence in *Missouri v. Seibert*, 542 U.S. 600 (2004), to determine whether statements made in a later, properly warned interrogation should be suppressed. In *Seibert*, law enforcement arrested a suspect, intentionally refrained from giving her *Miranda* warnings, and interrogated her in the middle of the night. *Id.* at 604–05. The suspect confessed, after which the officers gave her a brief break before recording a second interrogation—this time with *Miranda* warnings at the beginning—and eliciting

the same confession. *Id.* at 605. In the second interrogation, the officer specifically confronted the suspect with unwarned statements she had given previously. *Id.*

The interrogating officer admitted that he had consciously withheld the suspect's *Miranda* warnings. He told the trial court that he was using a technique where he would "question first, then give the [*Miranda*] warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 606. The trial court only suppressed the suspect's unwarned statements, and eventually the case was appealed to the Supreme Court.

Although there was no majority opinion, a concurrence by Justice Kennedy provided the final vote for suppression of the later-warned statements. The plurality had adopted a multifactor test to determine whether mid-questioning warnings were effective. However, Justice Kennedy would have resolved the case on narrower grounds, suppressing post-warning statements "only where the police intentionally used the two-step interrogation technique to render *Miranda* warnings ineffective." *United States v. Ollie*, 442 F.3d 1135, 1142 (8th Cir. 2006). In *Ollie*, the Eighth Circuit adopted Justice Kennedy's test as the controlling legal test. *Id.*

Additionally, the Eighth Circuit has found that, when there is no evidence of "deliberately coercive or improper tactics" such as a two-step interrogation technique, and when the two questioning sessions are separated by time and location, the case should be governed by *Oregon v. Elstad*, 470 U.S. 298 (1985). *United States v. Walker*, 518 F.3d 983, 985 (8th Cir. 2008). The *Elstad* Court held: "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." 470 U.S at 314.

### ii. Ms. Letourneau's Interrogations

Even if the Court had found that the house walkthrough violated *Miranda*, there is no evidence that it was part of an intentional interrogation technique where officers deliberately to circumvent their obligations under *Miranda*. First, there is no evidence of improper coercion on the part of Detective Hudson. Indeed, Ms. Letourneau initiated her cooperation with law enforcement. Even if *Miranda* warnings

9

had been necessary prior to the walkthrough after her initial offer of assistance, it is clear that Ms. Letourneau's statements were made voluntarily and with little prompting from Detective Hudson. The detective's actions are not the sort of deliberate scheme that *Seibert* aims to prevent.

Second, the initial house walkthrough and the recorded interview in the car are separated by both place and time—the first having occurred in the house and garage, and the second in Detective Hudson's squad car. The time elapsed between the two conversations is not long—approximately five to ten minutes—but the deliberate break supports a finding that no improper two-step interrogation occurred. *Walker*, 518 F.3d at 985; *c.f. Ollie*, 442 F.3d at 1141 (noting that an "immediate" attempt to have a suspect repeat his confession after being warned supported an inference of a intentional attempt to avoid *Miranda*).

Finally, unlike the officer in *Seibert*, who deliberately confronted the suspect with her pre-warning statements, Detective Hudson did not utilize Ms. Letourneau's statements during the walkthrough as leverage or as a coercive force. Indeed, the only references to Ms. Letourneau's previously offered cooperation are as a segue into a conversation about Mr. Voelz and his role in selling drugs on the property. (Ex. 2 at 3:30, 7:55.) The fact that Detective Hudson did not confront Ms. Letourneau with her pre-warning statements supports a finding that no improper interrogation scheme was afoot. *See United States v. Torres-Lona*, 491 F.3d 750, 758 (8th Cir. 2007) (finding no deliberate failure to warn where, in part, there was no evidence that officers confronted the defendant with his prior statement in order to have it repeated); *see also Seibert*, 542 U.S. at 605–06.

The cases Ms. Letourneau cites to support her assertion that *Seibert* should apply are inapposite. Most critically, both *United States v. Gross*, No. 08-cr-254 (MJD/JJK), ECF No. 87 (D. Minn. Dec. 19, 2008) and *United States v. Sims*, No. 13-cr-109 (DSD/JSM), ECF No. 32 (D. Minn. July 29, 2013), involve clearly coercive situations initiated by law enforcement, not voluntary statements made by the suspect. In *Gross*, officers removed the defendant from his home and placed him in a police vehicle during the execution of a search warrant. He was asked questions without a *Miranda* warning, and then later taken back to his house where a properly warned statement was obtained. Report and Recommendation, No. 08-cr-254, ECF No. 87 at

5–6. Similarly, in *Sims*, the initial pre-warning statement was obtained after officers frisked and handcuffed the defendant and before placing him in a police vehicle and questioning him. Report and Recommendation, No. 13-cr-109, ECF No. 32 at 6. By contrast, the pre-warning statements here were initiated by Ms. Letourneau's first offer to cooperate.

Under these circumstances, the concerns of *Seibert* are not implicated because there is no deliberate failure to administer *Miranda* in an effort to secure a confession. Therefore, the reasoning of *Elstad* applies and, absent a showing that the second statement was coerced, it need not be suppressed. *Walker*, 518 F.3d at 985. Ms. Letourneau does not argue that her post-*Miranda* statements were unknowingly or involuntarily made, and the Court does not see any basis in the record to find as such. Therefore, Ms. Letourneau's post-*Miranda* statements do not require suppression.

### C.   Intoxication

Ms. Letourneau further argues that all her statements must be suppressed because they were involuntarily given due to her "obvious intoxication." The Court disagrees. Intoxication, though plainly relevant to determining whether a statement was voluntary, does not result in an automatic finding of involuntariness. *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). Instead, the Court must determine whether intoxication caused a suspect's will to be overborne by questioning. *Id.*

Here, there is no evidence that Ms. Letourneau was actually intoxicated. Ms. Letourneau argues that her speech and her complaint about the heat in the police car clearly shows her intoxication, but the Court has listened to her recorded statement and does not agree with Ms. Letourneau's claim. Ms. Letourneau's speech is slightly slow, but not unusually so. (*See generally* Ex. 2.) And her answers to Officer Hudson's questions are coherent and easily understood. The encounter took place in August, which easily explains the heat. Additionally, Detective Hudson also expressed discomfort regarding the heat. (Ex. 2 at 1:35–1:43 ("So am I. God did not build me for the heat.").)

Furthermore, Detective Hudson testified that he is familiar with the effects of methamphetamine intoxication, and that Ms. Letourneau did not appear impaired or

11

intoxicated. (R. at 36–37, 46–47.) And there is nothing to suggest that Ms. Letourneau told the officers that she was under the influence of drugs. On this factual record, there is no clear evidence that Ms. Letourneau was intoxicated at all, let alone to the point as to overbear her will or render her *Miranda* waiver invalid. *See Gaddy*, 532 F.3d at 788. Accordingly, suppression on this basis is not warranted.

### D.   The Cell Phone Seizure

Finally, Ms. Letourneau argues that her cell phone should be suppressed because it was found in a vehicle that was not named in the search warrant. The Court disagrees. It has long been the rule in the Eighth Circuit that vehicles found on a premises are within the scope of a warrant authorizing the search of that area. *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002) (citing *United States v. Reivich*, 793 F.2d 957, 963 (8th Cir. 1986); *see also United States v. Dunn*, 723 F.3d 919, 929 (8th Cir. 2013). The limited exception to this rule is when the vehicle belongs to a "guest or other caller." *Pennington*, 287 F.3d at 745.

Ms. Letourneau has conceded that the Dodge Stealth belonged to her and not a "guest or other caller." (ECF No. 75 at 25.) But she argues that the cell phone must still be suppressed because officers searched the vehicle before knowing who owned it. This argument does not carry the day. First, the rule is that vehicles on the premises to be searched are, with one limited exception, within the scope of the warrant. Ms. Letourneau has cited no cases to suggest that officers need to confirm that a vehicle does not belong to a guest before searching it, and the Court has found no authority to support this argument. Indeed, the line of cases that developed the rule are silent as to a "subjective knowledge" requirement for the officers executing the search. Objectively speaking, the car did not belong to a guest or caller, and therefore, it was properly within the scope of the warrant and subject to search. Second, even if there was a subjective knowledge requirement, it is met here. Ms. Letourneau told Detective Hudson that the car was hers when she told him the car contained her phone. (R. at 35.)

Ms. Letourneau challenges this reality by arguing that law enforcement officers had actually searched her car earlier in the day, before she identified it as belonging to her. For two reasons, even if subjective knowledge were required, this argument does

12

not succeed.  First, there is no evidence that law enforcement actually searched the car prior to Detective Hudson's retrieval of the phone.  Ms. Letourneau submits a photograph of herself standing near the Dodge Stealth with the trunk open and several officers around as evidence that the car was searched. (Def. Ex. 1.)  And though Detective Hudson testified that the photograph was taken before Ms. Letourneau was taken through the house to retrieve her son, he did not know whether officers had opened the trunk or searched the vehicle. (R. 50.)  There is no other evidence before the Court to clarify when or how the trunk was opened.

Second, the Court need not actually know whether the officers searched the trunk at an earlier time of the day, because the cell phone Ms. Letourneau asks the Court to suppress was not seized during any initial search.[1]  Detective Hudson's seizure of the phone is clearly independent of any prior search, and at the time he entered the car, he knew for a fact it belonged to Ms. Letourneau because she told him so. (R. at 35.)  "Evidence should not be excluded…based on a constitutional violation unless the illegality is at least a but-for cause of obtaining the evidence." *United States v. Reed*, 921 F.3d 751, 755 (8th Cir. 2019) (quoting *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007)); *see also Segura v. United States*, 468 U.S. 796, 815 (1984).  Here, the but-for-cause of obtaining the cell phone—Ms. Letourneau's references to it during her interview—is entirely separate from any potential earlier improper search.

For all these reasons, the cell phone was legally seized, and suppression is not required.

## III.  Recommendation

In sum, as set forth above, the Court concludes that Ms. Letourneau's challenges to the constitutionality of the proceedings in this matter do not carry the day.  Accordingly, the Court makes the following recommendations:

---

[1] Additionally, there is no evidence before the Court that anything incriminating aside from the phone was seized from the car.  Even if it was searched earlier and that search was not covered by the warrant and was therefore illegal, there is nothing to suppress.

13

1. Ms. Letourneau's Motion to Suppress Statements (ECF No. 38) be DENIED; and
2. Ms. Letourneau's Motion to Suppress Search and Seizure (ECF No. 40) be DENIED.


Date: April 27, 2020                          *s/Katherine Menendez*
                                              Katherine Menendez
                                              United States Magistrate Judge


# NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.